212 N.J. Super. 678 (1986)
515 A.2d 1298
VINCENTE T. ZAPANTA, ET AL., PLAINTIFFS,
v.
DOLORES ISOLDI, ET AL., DEFENDANTS.
Superior Court of New Jersey, Chancery Division Monmouth County.
Decided August 22, 1986.
*680 Peter C. Visceglia for plaintiffs Zapanta (Wilentz, Goldman & Spitzer, attorneys).
James E. Collins for defendants Isoldi (Cerrato, O'Connor, Dawes, Collins, Saker & Brown, attorneys).
Stephan Siegel for plaintiffs Miller (Matlin & Siegel, attorneys).
McGANN, J.S.C.
These consolidated matters came on before the court for brief testimony and resolution pursuant to R. 4:67-5. The factual *681 positions of each of the parties have been fully set forth in the affidavits and certifications on file as clarified by the testimony taken. Each party fully briefed the matter prior to the hearing and each responded to the court's invitation to file post-hearing briefs. There are no genuine issues as to any material fact. The matter is ready for disposition.
The case involves the resolution of the rights of purchasers under two formal contracts signed by the seller for the sale of the same parcel of property. The parties believe that a so-called "3-day attorney review clause" contained in the first contract is the critical point on which this litigation turns. For reasons set forth below, I find that it is not. However, if incorrect in that conclusion and assuming that the clause is implicated, I find that it affords no protection to the defendant-seller under the first contract. The facts are as follows.
Defendant, Dolores Isoldi, was, prior to April 28, 1986, the sole owner of a substantial residence on property known as 18 Georjean Drive, Holmdel, New Jersey. Her profession is that of a real estate broker. She has been in active practice in that occupation for some 12 years and is presently associated with the Weichert agency.
Having decided to sell her house she listed it through the Weichert agency which, in turn, placed it on multiple listing. A number of prospective purchasers expressed interest in the property.
Plaintiffs, Zapanta, both of whom are doctors of medicine admitted to practice in New Jersey, very much desired to purchase the home. They had visited it on April 14, 1986 accompanied by Elizabeth Thomas, a real estate broker associated with the MacKenzie-Morris realtors. She and Mrs. Isoldi were acquainted professionally. Their offices are within three doors of each other on the same side of Main Street in Holmdel. They discussed price and by a series of negotiations agreed on $432,000 to be paid by the Zapantas. In addition, the selling broker, Thomas, agreed to reduce her commission due on the *682 sale by $3,000 so that Isoldi was, in effect, receiving $435,000 for the house.
Realizing that Isoldi was still attempting to sell the house for a higher price to any other interested party, the Zapantas pressed to obtain a signed contract as soon as possible. The contract was prepared by Thomas on a standard, printed, "realtor" form on which she inserted certain typed information. Also attached was an addendum page containing paragraphs relating to engineering inspection, termite inspection, warranties, certificate of occupancy and contingency dates. The contract was given to the Zapantas who immediately, on Saturday, April 19, 1986, took it to their attorney, Vincent Maltese, for his review. He went over it with them and approved it. They signed it.
Included, at their request, in the typed information on the printed form were these statements:
PURCHASER'S AGREE TO WAIVE THE ATTORNEY REVIEW PERIOD.
and, in a separate place,
Purchaser represents that their attorney has reviewed this contract and has approved same in its present form.
At that same meeting, the Zapantas verbally authorized Maltese to negotiate and agree to any reasonable terms in order to assure their obtaining title to the house. After signing the contract, they delivered it on that same day (Saturday, April 19) to Thomas, who, in turn, brought it to Isoldi and left it with her for signature.
Isoldi and her daughter had scheduled a trip on Monday, April 21, to look at prospective college placements for the daughter. She expected to return on April 24. On Sunday evening, April 20, she called Thomas, advised her that she had decided to sign the Zapanta contract and stated that she would drop it off at Thomas' office the next day. Early in the morning of April 21, she brought the contract to the office of her attorney, Joseph Meehan, discussed it with him, signed it *683 and then delivered it to Thomas' office. Thomas was not present at that time.
The contract, when delivered, was not dated. Although signed and delivered on April 21, Isoldi deliberately inserted alongside her signature on the printed form and above her signature on the addendum, the date "4/22/86." She testified that being quite familiar with the "3-day attorney review clause" she believed that she could, and indeed did intend, in that fashion, to extend the beginning time for the attorney review period from April 21 to April 22 so that she could reassess her options on her return on April 24.
When Thomas came to her office later in the day on April 21 she found, as expected, the signed contract. It also seems probable that Thomas, at that point, called Isoldi at home to acknowledge receipt of the contract. Isoldi testified that during the conversation she told Thomas of the "4/22/86" dating and stated her reason for so doing was the two-day trip she was starting later that day with her daughter. Thomas does not remember that item of the conversation. I believe her when she says so. That lack of memory  given the real estate experience of both; the Zapantas' desire to pin Isoldi down to a signed contract and Thomas' interest in a commission  causes me to infer that it was a passing reference at best and not emphasized by Isoldi as critical in her mind, then. In any event, Thomas did not notice the "4/22/86" notation at that time. Vincente Zapanta picked up the signed contract that same day right after the Thomas call to Isoldi. He likewise did not immediately note the "4/22/86" notations made by Isoldi. When he did notice them within a day or so, he questioned Thomas who said it had something to do with a short trip Isoldi was making with her daughter for the purpose of looking at prospective colleges.
In the afternoon of April 21, Meehan called Maltese (who was not then in his office) to discuss two minor changes which Isoldi had indicated to him earlier in the day that she wished made. *684 The first was permission to remove an antique medicine cabinet from a utility room in the house without responsibility to replace it with a substitute. The second was to change the termite clause to provide that any termite damage discovered would be the responsibility of the buyers to repair but that if repairs exceeded $500 the buyers would have the right to void the contract. As written, the contract provided that the seller had responsibility to make such repairs but if they exceeded $500 the purchaser had to pay the excess or either party could void the contract. Maltese, acting on the prior authorization of his clients, immediately agreed to the changes. Meehan was to confirm their understanding in writing.[1] He did so that same day and mailed the confirmatory letter to Maltese with a request to sign and return a copy to confirm the Zapantas' assent to the changes. That letter was received by Maltese on April 23. On that day he prepared and submitted a mortgage application for the Zapantas. The Zapantas themselves made a separate mortgage application to another financial source  also on April 23.
On April 24, Maltese signed the confirmation on the copy of Meehan's April 21st letter and directed that it be mailed back to Meehan. The Maltese reply is postmarked April 25. It was received by Meehan on April 28.
On April 24, Isoldi returned home and received a better offer ($445,000) for the house. She reached Meehan at his home by telephone in the early evening, told him of the offer and directed him to cancel the Zapanta contract. He told her that he would prepare the necessary letter of termination on his *685 return to his office that evening and instructed her to come to his office the next day to pick it up. Isoldi also reached Thomas at her home at about midnight that night and told her essentially the same thing. Thomas was not particularly pleased with that information. Isoldi went to Meehan's office early in the morning of April 25. He had drafted a letter to Maltese dated April 24, 1986. The body of it is as follows:
Dear Mr. Maltese:
At the time my letter of April 21, 1986 was forwarded to you, my client was in the process of leaving New Jersey on a trip out of State with her daughter, and my client did not return to New Jersey until late yesterday. Upon her return to New Jersey, and upon reviewing my letter to you of April 21, 1986, Mrs. Isoldi contacted me, and advised me that she did not agree with the terms of my letter of April 21, 1986.
Accordingly, pursuant to the Attorney Review provision of the Broker's Contract herein, you are hereby notified that the Contract is not acceptable to me, and that the proposed sale of the premises by Mrs. Dolores Isoldi to Dr. and Mrs. Vincente Zapanta is terminated. The within termination of the contract also terminates the modifications proposed in my letter to you of April 21, 1986.
I am forwarding a copy of this letter to the Selling Broker so that arrangements can be made for said Broker to return to your clients any deposit which may have been posted by them.
Very truly yours,
Isoldi hand-carried the letter to Maltese the same morning (April 25) and delivered a copy of it to Thomas at the MacKenzie-Morris agency as well. Immediately on its receipt, Maltese prepared a reply rejecting the termination of the contract. That letter was hand delivered to Meehan that same day. Later that very day Isoldi signed a contract with the Millers for $445,000. The Millers understood that there had been a prior signed contract but believed Isoldi who told them that it had been properly terminated under "the attorney review clause."
With regard to attorney review, the form contract has printed at the top the following language in bold print:
THIS IS A LEGALLY BINDING CONTRACT THAT WILL BECOME FINAL WITHIN THREE BUSINESS DAYS. DURING THIS PERIOD YOU MAY CHOOSE TO CONSULT AN ATTORNEY WHO CAN REVIEW AND CANCEL THE CONTRACT. SEE SECTION ON ATTORNEY REVIEW FOR DETAILS.
*686 The attorney review section in the Zapanta contract is as follows:
18. Attorney Review
1. Study by Attorney

The buyer or the seller may choose to have an attorney study this contract. If an attorney is consulted, the attorney must complete his or her review of the contract within a three-day period. This contract will be legally binding at the end of this three-day period unless an attorney for the Buyer or the Seller reviews and disapproves of the contract.
2. Counting the Time.

You count the three days from the date of delivery of the signed contract to the Buyer and the Seller. You do not count Saturdays, Sundays or legal holidays. The Buyer and the Seller may agree in writing to extend the three-day period for attorney review.
3. Notice of Disapproval

If an attorney for the Buyer or the Seller reviews and disapproves of this contract, the attorney must notify the REALTOR(S) and the other party named in this contract within the three-day period. Otherwise this contract will be legally binding as written. The attorney must send the notice of disapproval to the REALTOR(S) by certified mail, by telegram, or by delivering it personally. The telegram or certified letter will be effective upon sending. The personal delivery will be effective upon delivery to the REALTOR(S) office. The attorney may also, but need not, inform the REALTOR(S) of any suggested revision(s) in the contract that would make it satisfactory.
On April 28, 1986, Dolores Isoldi deeded the property to her older daughter. On that date the daughter signed a new, but identical, contract with the Millers. On the strength of their contract with Isoldi, the Millers sold their home to another party. They are presently facing a "time of the essence" closing under that contract.

I.
To analyze the legal consequences of Isoldi's actions it is helpful to consider what the result would be had there been no attorney review paragraph in the Zapanta contract. The parties contemplated a writing to specify the terms of their mutual agreement  Zapanta to purchase and Isoldi to sell. Mutuality of obligation, essential to the buyer's action for specific performance, did not arise until acceptance of the Zapanta offer (in *687 the form of the written agreement signed by them) by Isoldi, in the fashion contemplated by the parties (her signing the contract). Until a delivery of the signed contract by Isoldi there could be no mutuality of obligation, for even though signed, no one but Isoldi would be the wiser and she would retain the power to tear up the document. In that event the Statute of Frauds (N.J.S.A. 25:1-5) would bar relief to Zapanta. Madaio v. McCarthy, 199 N.J. Super. 430, 433 (App. Div. 1985). What makes her acceptance of the agreement unequivocal is the relinquishing of physical control over the signed document by delivery of it. Delivery in this case was direct. Isoldi clearly recognized Thomas as the Zapantas' agent for that purpose.
Isoldi did a curious thing when she delivered the signed contract on April 21. As delivered, the contract was undated. The insertion of a date is not essential to the formation of the contract. 1 Williston, Contracts, (3 ed. Jaeger 1957), § 210 at 777; 17 Am.Jur.2d 405, Contracts, § 69. Isoldi did not insert a date. What she did do was add alongside her signature on the printed form "4/22/86" and above her signature on the addendum page "4/22/86." Her reason for doing so, expressed or otherwise, is legally irrelevant. Her trial testimony, at best confusing, indicates that her motivation was to stave off the running of the attorney review period as long as possible so that she could reject the Zapanta agreement if a better offer came up. Motivations or mental reservations cannot affect a written agreement. If they were permitted to do so, a written agreement would be worthless and the source of much litigation. The avoidance of such uncertainty is the precise reason for the Statute of Frauds and the companion parole evidence rule. The parties are bound by the intentions they express in their writing so long as that writing is complete and unambiguous on its face  as this contract is. 17 Am.Jur.2d 355, Contracts § 19; 1 Williston, supra, § 94 at 338. That notation  "4/22/86"  was not part of the agreement of the parties and, regardless of the meaning which Isoldi attaches to it, cannot be binding on the Zapantas.
*688 If Isoldi intended that one who read the contract would believe that she had signed it on April 22, that would be a misrepresentation of fact. If she intended an inference that the contract had been delivered on April 22, that likewise would be a misrepresentation of fact.
The last paragraph of the addendum page reads as follows:
CONTINGENCY DATES
All contingency dates are to commence to run from the date of fully approved contract by both attorneys.
DATE: 4/22/86
It was that "4/22/86" which she inserted when signing the addendum. If she intended thereby that a reader believe that that contract had been fully approved by both attorneys on April 22, that also would be a misrepresentation of fact. They had both fully approved it, as written  Maltese on April 19 and Meehan on April 21.
The insertion of "4/22/86" therefore had no legal effect. The contract was binding as of its delivery to the broker on April 21. Its terms could not therefore be changed by unilateral action. When Meehan asked on behalf of Isoldi for the two modifications, Zapantas' attorney could have simply refused and the contract as delivered would remain in force. By his authorized acceptance of those changes the contract was amended accordingly. There is, in fact, a writing setting forth the terms of the modifications signed by the authorized agents of the parties. The Statute of Frauds has been satisfied in that regard. Gabesons Realty Co. v. Natelsons, 208 N.J. Super. 684, 687 (App. Div. 1986). Therefore, absent the "attorney review clause" the parties to the action had a binding contract, including modifications, as of April 21, 1986 under which plaintiffs would be entitled to a judgment for specific performance.

*689 II.
How, if at all, does the attorney review paragraph in this case change the foregoing result? Long before N.J. State Bar Ass'n v. N.J. Ass'n of Realtor Bds., 93 N.J. 470 (1983), parties, at times, did include some variation of an attorney review requirement in contracts for the sale of real estate. N.J. State Bar Ass'n v. N.J. Realtor Bds. Ass'n, 186 N.J. Super. 391, 396 (Ch.Div. 1982). An attorney review provision can be inserted in a contract either as a condition precedent or as a condition subsequent. Thus the parties could provide  "The contract represented by this document will not come into existence until reviewed by and approved in writing by the attorneys representing each party." Until that review was accomplished and approval given, there would be no enforceable agreement. Or the parties could provide  "This agreement is binding and enforceable when signed by both seller and buyer, but if the attorney for either notifies the other party in writing within five days after signature that he disapproves of the agreement, it will thereupon be terminated and of no further force and effect." In that case there would be a binding agreement subject to termination upon the happening of a condition subsequent. Parties always have been and continue to be free to insert in their agreements variations of conditions precedent or subsequent based on attorney review.
And so in N.J. State Bar Ass'n v. N.J. Ass'n of Realtor Bds., supra, the Supreme Court added nothing to the substantive law of contracts. It did give approval to a condition regarding attorney review, to be inserted in a limited class of broker-prepared real estate contracts for the purpose of protecting the parties thereto from improvident terms.
That case never produced a judicial decision. A stipulation of settlement agreed to by the parties  each with an economic interest to protect  was approved by the Supreme Court. The judicial decision sought by the complaint, viz., whether the preparation of any real estate contract by a broker constituted *690 the disorderly persons offense of unauthorized practice of law, was never rendered. State v. Bander, 56 N.J. 196 (1970); N.J. State Bar Ass'n v. N.J. Ass'n of Realtors Bds., supra 93 N.J. at 472. The Bander problem remains unresolved to this day. N.J.S.A. 2A:170-78 and 81 were not repealed by the enactment of the New Jersey Code of Criminal Justice (N.J.S.A. 2C:98-3).
The Court approved "attorney review provision" applies only to contracts prepared by real estate brokers and sales persons licensed by the New Jersey Real Estate Commission. It does not apply to contracts prepared by the parties themselves or any other persons for them (although such persons would run the risk of prosecution under N.J.S.A. 2A:170-78).
As regards contracts for the sale[2] of real estate, the clause applies only to residential properties containing one to four-dwelling units or to a vacant one-family lot. It does not apply to broker-prepared contracts for the sale of all other kinds of vacant land, or to commercial business or industrial property or to residential dwellings containing five or more units.
The clear intent of the Court was to protect buyers and sellers of property in the limited class by giving them an opportunity, after signing the broker-prepared contract, to obtain an attorney's review of it and perhaps his disapproval of it in their name provided that it was done within three days. N.J. State Bar Ass'n v. N.J. Ass'n of Realtor Bds., supra, 186 N.J. Super. at 398. For a contract prepared by the parties themselves there is no protection from overreaching. They are left to basic common law principles.
The focus of the above discussion is not to minimize the salutary effect of what was done but to indicate what a very narrow change it made in existing law. In return for protection from the threat of unauthorized practice, brokers submitted to mandatory contract language.
*691 In addition to furnishing the protection of legal advice to this limited class of buyers and sellers, the Court was concerned that those people would actually read the protective language. It required certain amendments to the stipulation of settlement so as to conform its terms to the Plain Language Law, N.J.S.A. 56:12-1 to -13. This type of consumer contract was to be expressed in a "simple, clear, understandable and easily readable way." To that end the Court required
that each such contract contain conspicuously at the top of the first page the following language:
THIS IS A LEGALLY BINDING CONTRACT THAT WILL BECOME FINAL WITHIN THREE BUSINESS DAYS. DURING THIS PERIOD YOU MAY CHOOSE TO CONSULT AN ATTORNEY WHO CAN REVIEW AND CANCEL THE CONTRACT. SEE SECTION ON ATTORNEY REVIEW FOR DETAILS
and shall also contain the following language within the text of every such contract.
ATTORNEY REVIEW:
1. Study by Attorney
The Buyer or the Seller may choose to have an attorney study this contract. If an attorney is consulted, the attorney must complete his or her review of the contract within a three-day period. This contract will be legally binding at the end of this three day period unless an attorney for the Buyer or the Seller reviews and disapproves of the contract.
2. Counting the Time.
You count the three days from the date of delivery of the signed contract to the Buyer and the Seller. You do not count Saturdays, Sundays or legal holidays. The Buyer and the Seller may agree in writing to extend the three-day period for attorney review.
3. Notice of Disapproval.
If an attorney for the Buyer or the Seller reviews and disapproves of this contract, the attorney must notify the Broker(s) and the other party named in this contract within the three-day period. Otherwise this contract will be legally binding as written. The attorney must send the notice of disapproval to the Broker(s) by certified mail, by telegram, or by delivering it personally. The telegram or certified letter will be effective upon sending. The personal delivery will be effective upon delivery to the Broker's office. The attorney should also inform the Broker(s) of any suggested revisions in the contract that would make it satisfactory.
[N.J. State Bar Ass'n, supra 93 N.J. at 475-476.]
And so by approving the settlement the Court achieved two purposes: 1) insulating real estate brokers and salespersons from claims of unauthorized practice of law when preparing *692 this limited type of contract, 2) protecting the consuming public (buyers and sellers of residential real estate) from improvident terms inserted in such contracts  by means of attorney review and with clear notice to them of both its availability and advantages.
Thomas prepared the contract for the Zapantas and Isoldi on a printed form containing the approved language of the consent judgment. It was really unnecessary that she did so, for she had neither buyers nor sellers sign until their attorneys had first reviewed its terms. She could have used a form which did not have the attorney review language without 1) running the hypothetical risk of a charge of unauthorized practice of law or 2) violating the public policy of protecting residential buyers and sellers of property. Although she prepared the document she gave it to them not to sign but rather to have it reviewed by their respective attorneys. In addition, as Thomas knew, Isoldi herself was quite knowledgeable in real estate transactions. This, then, was never a transaction for which the attorneys' review language was created.
Nonetheless the parties signed the contract with the attorney review language in it. It is part of their agreement. The eye-catching language at the top of the first page is not, however, part of the contract itself. Its purpose is to draw attention to the attorney review provision which is part of the contract. The critical contract language of that provision is contained in the sentence: "this contract will be legally binding at the end of this three-day period unless an attorney for the Buyer or Seller reviews and disapproves of the contract." In traditional contract parlance that sentence seems to make the formal agreement  when signed  at one and the same time a contract on a condition precedent favorable to lawyers (that is, not enforceable until after the three-day period with no attorney disapproval) and a binding contract with a condition subsequent favorable to realtors (that is the parties were bound and would continue to be bound unless attorney disapproval took place within the three days). The fact that the language could, *693 of course, have been made plainer  and yet was not  is the product, one assumes, of a settlement quite difficult to achieve. Nonetheless, it is the language now included in all broker-drawn contracts for the sale of residential property.
Does it affect these parties? It does not. The fact that a broker-drawn contract would be, in fact, approved  not disapproved  by the attorneys for both parties, was never within the contemplation of either side in N.J. Bar Ass'n, supra, nor within that of the Court when it approved the settlement. The concern of the lawyers was that they be able to represent their clients before the contract became binding and enforceable; that of the realtors was freedom to obtain signed contracts (from which they derive their livelihood) without a continuing threat of prosecution for unlawful practice of the law. The concern of the Court was consumer protection. Therefore, the emphasis was placed on the opportunity to disapprove. There was no need for concern on the part of any of the three-lawyers, brokers or Court  with a contract approved by lawyers for each side. Lawyer approval of a broker-prepared contract was the optimum situation for all concerned.
If the argument is made that a contract  signed by both parties after approval by their respective lawyers  can thereafter be rendered a nullity by the disapproval within any period of time by a lawyer for either, it is simply irrational. Such contract was binding and enforceable when approved, signed and delivered. It cannot be unilaterally terminated. That is good sense and good law. The attorney review paragraph is a condition in derogation of long-established contract principles. As such, it is to be given narrow rather than a broad construction. There is simply no need to overturn contract principles which have been understood and followed for many years by reading the attorney review language to mean that an agreement which was openly negotiated, clearly approved and formally signed, can be undone at the whim of one of the parties. *694 Therefore, once the contract was delivered, Meehan's letter disavowing the contract was an empty gesture.
The modifications subsequently agreed to are not covered by the attorneys' review provision. They were not the creation of the broker, but thereafter negotiated for the parties by their attorneys.

III.
Should the foregoing holding ultimately be rejected and it be held that, despite prior attorney approval, there was still the power within three days to do an about-face and effectively disapprove and terminate the contract, then it must be decided whether disapproval was given in an effective fashion.
When does the review period begin? When does it end? It begins when the parties have made an otherwise binding contract. The pertinent language is "You count the three days from the date of delivery of the signed contract to the buyer and seller." In this case it occurred sometime near 12:00 noon on April 21. Three days from that point is approximately 12:00 noon on April 24. There is no need to interpret the three-day language more expansively than that. Cf. Door-to-Door Home Repair Sales Act of 1968, N.J.S.A. 17:16C-95 et seq. at 99. If the parties desired more than those three days the same paragraph tells them that "The Buyer and the Seller may agree in writing to extend the three-day period for attorney review." Isoldi's unilateral act in inserting "4/22/86" after her signature could not work such an extension. The contract not having been disapproved on April 24, became, as is, final and binding.
Therefore, in docket no. C-3408-86, the Zapantas are entitled to judgment for specific performance against defendants Isoldi. That judgment will provide for a title closing no later than September 15, 1986, at 4:00 p.m.
In docket no. C-4170-86, the Millers claim for specific performance must, necessarily, be denied. Their claim for damages *695 for breach of contract remains and is to be transferred to the Law Division where it can more appropriately be resolved.
Mr. Visceglia will prepare and submit the judgment in docket no. C-3408-86. Mr. Siegel will prepare and submit the order in docket no. C-4170-86.
NOTES
[1] This conversation came about in the following fashion. When Meehan called Maltese's office he spoke to Maltese's secretary for Maltese was not in. She did reach Maltese on another line and had Maltese on one phone and Meehan on the other. She "relayed" their conversations in this fashion. Although they did not speak directly to each other, there is no question but that they understood and agreed to the terms of the two changes as set forth on behalf of their respective clients. Maltese's secretary made complete stenographic notes of their agreement.
[2] The clause also applies to leases of one year or more for residential dwelling units.