Re NEVETS C.M., INC.

v.

NISSHO IWAI AMERICAN CORPORATION.

Civ. A. No. 88–4159.

United States District Court, D. New Jersey.

Sept. 29, 1989.

526

Stanley E. Stein, Stanley E. Stein & Associates Co., Ltd., Cleveland, Ohio, and Stephen C. Greene, Holland & Holland, P.C., Secaucus, N.J., for plaintiff.

Gerald C. Harvey, Hannoch Weisman, P.C., Roseland, N.J., for defendant.

## OPINION AND ORDER

LECHNER, District Judge.

This matter is before the court on the motion of defendant Nissho Iwai American Corporation ("NIAC") for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Subject matter jurisdiction exists in this case pursuant to 28 U.S.C. § 1332 (diversity of citizenship). For the reasons which follow, NIAC's motion is granted.

### Background

Plaintiff in this action, Nevets, C.M., Inc. ("Nevets") is a New Jersey corporation engaged in the rental of video cassette players ("VCPs"). Nevets was incorporated in April 1984 by Steven Marcus ("Marcus") and Melvin Parker ("Parker"). According to Marcus' deposition testimony, Nevets operated as a partnership, "not a formal corporation." Brief in Support of NIAC's Motion for Summary Judgment, dated 9 June

1989 ("Defendant's Brief"), Exhibit A at 39. Parker, who had experience in the television and VCP rental business prior to founding Nevets, is the general sales manager of Nevets. Marcus is president and sole shareholder of Nevets, but Parker holds an irrevocable option to purchase up to fifty percent of the outstanding shares of Nevets. *Id.*, Exhibit A at 10–12.

Beginning in the Fall of 1984, Nevets began to purchase from NIAC VCPs described as model number VP–1500, manufactured by Funai Electric Co., Ltd. ("Funai"). NIAC is a trading company engaged in the distribution of VCPs manufactured by Funai. NIAC is organized under the laws of New York, with principal offices in New York City.

On 1 December 1989, Nevets and NIAC entered into an agreement for the warehousing of Funai VCPs. The warehousing agreement was signed by Parker on behalf of Nevets. In addition, Parker executed a guarantee to NIAC ensuring Nevets' performance under the warehousing agreement. *Id.*, Exhibit A.

Soon after signing the warehousing agreement, Nevets claimed the VCPs sold by NIAC suffered from operational defects which made them unsuitable for rental to Nevets' customers. Representatives of Nevets and NIAC held a meeting on 29 August 1985 to discuss Nevets' complaint and NIAC's demand that it be paid by Nevets for VCPs it purchased from NIAC. At that meeting, Teijiro Kakutani ("Kakutani"), chairman of Harjoy, Inc. ("Harjoy")[1], gave the Nevets representatives a letter, dated 29 August 1985, addressed to Parker from T. Sasaki ("Sasaki"), Vice President of General Merchandise of NIAC. The letter authorized Kakutani to negotiate on behalf of and bind NIAC on any settlement agreement regarding Nevets' claim.

In a letter agreement, dated 6 September 1985, the parties memorialized the agreement reached at the 29 August meeting (the "6 September 1985 Letter"). The 6 September 1985 Letter, which was prepared by Kakutani and accepted by Parker on behalf of Nevets, stated Nevets owed NIAC $189,961.11. It stated there had been problems with the VCPs purchased by Nevets and the payment by Nevets of the money it owed to NIAC would be frozen for ninety days to permit Nevets time to evaluate the performance of refurbished VCPs provided by NIAC. The 6 September 1985 Letter also indicated there would be no litigation by either party and they would settle the matter at a meeting on 29 November 1985. Finally, a handwritten and initialed addition to the 6 September 1985 Letter stated: "it is acknowledged that Nevets maintains that is [sic] has claims against NIAC." Certification of Teijiro Kakutani, dated 3 June 1989 ("Kakutani Certification"), Exhibit C.

The meeting scheduled for 19 November 1985 did not take place; by mutual agreement the parties moved the meeting to mid-December. *Id.* at 3, ¶ 5. On 15 December 1985 a meeting took place in which Parker submitted to NIAC claims of losses sustained by Nevets of $569,145.45 as a result of the allegedly defective VCPs. Nevets contends Kakutani represented to Parker and Marcus at this meeting that the problems allegedly existing with "the VCPs had been corrected and the new line of [VCPs] would be excellent for the rental market." Brief of Nevets in Opposition to NIAC's Motion, dated 26 July 1989 ("Plaintiff's Opposition Brief"), at 4.

In a second letter agreement, dated 24 December 1985 (the "24 December 1985 Letter"), Kakutani prepared for Parker's acceptance on behalf of Nevets an outline of the discussions which took place on 15 December 1985. The 24 December 1985 Letter provided in paragraph three:

> Nevets, C.M. agreed to withdraw all the claims to NIAC, FUNAI and Harjoy. While NIAC agreed not to make any claim to Nevets C.M., Inc. on this matter.

Kakutani Certification, Exhibit C. In addition, the 24 December 1985 Letter set forth

---

**1.** The relationship between NIAC and Harjoy is unexplained, but it appears Harjoy plays a part in distributing Funai VCPs in the United States.

*See* Plaintiff's Supplemental Exhibits, Exhibit G at second unnumbered page; Defendant's Brief, Exhibit A, at 27, 173–174.

a payment schedule for Nevets to pay the $189,961.11 it owed to NIAC: $100,000 was due on 26 December 1985 and the balance was due on 10 February 1986 with interest from 26 December 1985.[2] The remaining sections of the letter provided:

> 2) As a compensation for the losses which have been caused to Nevets C.M. Inc. by the malfunction and defects of some of VP–1500 (earlier version), FUNAI will supply Nevets C.M. with 500 New VP–1500 free of charge.
>
> \*     \*     \*     \*     \*     \*
>
> 4) Mr. Parker requested that after the completion of the payment by Nevets C.M. Inc., NIAC resume "open credit" to Nevets C.M. Inc.
>
> 5) Mr. Parker requested that his service Co. (Larry & Sheila T.V. Corp. 1588 York Ave.) be allowed to be "FUNAI AUTHORIZED SERVICE STATION" as long as he wishes. Mr. Taku Miyamoto, on behalf of FUNAI USA which handles "SERVICE" matter, requested that he be given a few days to discuss the matter with FUNAI USA.
>
> 6) The parties concerned confirmed to continue the business.

*Id.*

The 24 December 1985 Letter was executed by Kakutani on behalf of NIAC and by Parker on behalf of Nevets. Parker, however, testified in his deposition he did not remember whether he signed the letter. Plaintiff's Opposition Brief, Exhibit F, at 134–35. According to his deposition testimony, Parker also did not remember signing blank pieces of paper, although he testified he may have done so. *Id.* Additionally, referring to the 24 December 1985 Letter, Marcus testified at his deposition: "I never saw this letter signed. I do not know how it could be signed. I mean that sincerely." Defendant's Brief, Exhibit A

at 201. In contrast, Kakutani unequivocally established he personally took the letter to Parker's office in New York City where Parker signed the letter in Kakutani's presence. Kakutani Certification at 3, ¶ 7. At oral argument, counsel to Nevets conceded Nevets did not contest the facts that Parker signed the 24 December 1985 Letter and that Parker was authorized to do so on behalf of Nevets.

On 26 December 1985, Parker signed and accepted a letter from Kakutani indicating Funai had agreed to keep Parker's company as an authorized service center for Funai VCPs. Plaintiff's Opposition Brief, Exhibit B. In addition, a letter, dated 23 December 1985, from Sasaki to Parker stated NIAC had opened a line of credit for Nevets. Parker confirmed this letter by signing it as well. Defendant's Brief, Exhibit A. At oral argument, counsel to NIAC represented although the letter was dated 23 December 1985, it was delivered to Nevets with or after the 24 December 1985 Letter. Counsel for Nevets did not contest this representation; the delivery date of the 23 December 1985 Letter is not an issue in this case.

Nevets alleges Marcus and Parker telephoned Kakutani after receiving the 24 December 1985 Letter and objected to various provisions of it. On 27 December 1985, Marcus purportedly sent a letter to Kakutani confirming the telephone conversation (the "27 December 1985 Letter").[3] Plaintiff's Opposition Brief, Exhibit C; Defendant's Brief, Exhibit A, at 201.

The 27 December 1985 Letter contained four numbered paragraphs. Paragraph one states Parker was general sales manager of Nevets.[4] Paragraph two states the portion of the 24 December 1985 Letter relating to replacement VCPs should have indicated the replacement VCPs would be

---

**2.** The 24 December 1985 Letter stated "Mr. Parker will try to have Nevets C.M. pay the balance of $89,961.11 by Dec. 31 '85." *Id.* Nevets made both payments by checks, dated 27 December, 1985, and 12 February, 1986, respectively. Certification of Masamichi Azeyanagi, dated 10 August 1989, at 1, ¶ 2.

**3.** The substance of the telephone conversation is not described in Nevets' submissions to this court. Apparently, the 27 December 1985 Letter contains all the relevant discussions that allegedly occurred in the telephone conversation.

**4.** In the 24 December 1985 Letter, Parker was designated "Owner of Nevets C.M."

in "partial compensation for losses," the balance to be discussed once it was established the replacement VCPs were not defective. In paragraph three, the 27 December 1985 Letter states the payment schedule set forth in the 24 December 1985 Letter "was never agreed to, since it would not make economic sense to release $569,-145.45 in losses for repayment with $100,-000 dollars worth of merchandise that we are still not sure solves the problem." *Id.* Finally, paragraph four states Nevets agreed with the remaining portions of the 24 December 1985 Letter.

The 27 December 1985 Letter was not confirmed or executed by any NIAC representative. In fact, NIAC claims it never received the 27 December 1985 Letter at all. Supplemental Certification of Teijiro Kakutani, dated 9 August 1989 ("Kakutani Supplemental Certification"), at 2 ¶ 4. In addition, Kakutani claims he never discussed the matters asserted in the 27 December 1985 Letter with anyone associated with Nevets.[5]

The final piece of correspondence offered by Nevets in opposition to this motion for summary judgment is dated 12 March 1987, from Sasaki to Parker. Plaintiff's Opposition Brief, Exhibit E. The substance of this letter is similar to the letter presented by Kakutani to representatives of Nevets at the initial meeting on 29 August 1985. The second letter states: "Concerning the settlement of the quality claims currently pending regarding Funai VCPs we have sold to you, we will leave all the power to Mr. Kakutani.... His decision will bind us." *Id.* This language is identical to that used in the earlier letter, dated 29 August 1985.

Finally, Nevets has pointed to internal memoranda written among officers of NIAC, which Nevets claims discuss the Nevets matter as though the "quality claim" matter continued beyond March 1987. *Id.*, Exhibit G.

On 26 September 1988 Nevets instituted the instant action claiming damages for losses incurred as a result of the allegedly defective VCPs.

*Discussion*

NIAC has moved for summary judgment contending the 24 December 1985 Letter constituted a full settlement of the claims between the parties which operates to bar Nevets' claim regarding the defective VCPs. In the alternative, NIAC argues the 24 December 1985 Letter is a release by Nevets of its claims against NIAC and an accord and satisfaction of Nevets' unliquidated claim against NIAC.

In opposition, Nevets has attempted to show this dispute is not ripe for summary judgment because it contends (1) there is a genuine issue of material fact as to whether the 24 December 1985 Letter is a completed, binding agreement or merely an incomplete agreement to agree containing indefinite material terms; (2) the issue of whether the 24 December 1985 Letter is a valid release cannot be decided as a matter of law; and (3) the letter does not constitute a valid accord and satisfaction.

Because these issues may be resolved as a matter of law, NIAC's motion for summary judgment is granted. Taking Nevets' allegations to be true, the 24 December 1985 Letter was a binding agreement in settlement of Nevets' claims against NIAC. The 27 December 1985 Letter has no affect on the settlement agreement contained in the 24 December 1985 Letter.[6] Moreover, the 24 December 1985 Letter acts as a release and an accord and satisfaction of Nevets' claim.

## A. Summary Judgment Standard

To prevail on a motion for summary judgment, the moving party must establish

---

5. It is noted that neither Marcus nor Parker has submitted an affidavit to support Nevets' assertion that the 27 December 1985 Letter was mailed to NIAC. However, Marcus testified at his deposition that Parker called Kakutani with objections to the 24 December 1985 Letter and that Marcus sent the 27 December 1985 Letter to Kakutani. Defendant's Brief, Exhibit A, at 201.

6. Neither the 12 March 1987 Letter nor the internal memoranda of NIAC affects the settlement embodied in the 24 December 1985 Letter. These items may be relevant to performance of the settlement agreement but they do not invalidate it or suggest settlement was not reached.

"there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The district court's task is to determine whether disputed issues of fact exist, but the court cannot resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *See Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a fact issue,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' ... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'

*Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1356 (emphasis in original, citations and footnotes omitted).

· The Court elaborated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citations omitted): "If the evidence [submitted by a party opposing summary judgment] is merely colorable ... or is not significantly probative ... summary judgment may be granted." The Supreme Court went on to note in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (footnote omitted): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323–24, 106 S.Ct. at 2553. Thus, once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with *specific* facts evidencing a need for trial. *See* Fed. R.Civ.P. 56(e).

### B. Undisputed Facts

In this case a number of facts which appear on a review of Plaintiff's Opposition Brief to be in dispute do not preclude granting NIAC's summary judgment motion. In opposition to NIAC's motion, Nevets has attempted to show a genuine issue of material fact still exists [7] in this case. Nevertheless, assuming all of Nevets' allegations to be true, the dispute can be resolved in favor of NIAC as a matter of law.

Taking all of Nevets' allegations established by deposition or other sworn submissions to be true, and drawing all favorable inferences, the facts relevant to this motion can be summarized as follows. On 29 August 1985, representatives of NIAC and Nevets met to discuss Nevets' complaints regarding the allegedly defective VCPs. At that meeting, Kakutani presented a let-

---

**7.** As conceded by Nevets' counsel at oral argument, many of the asserted genuine issues of material fact are raised only by unsworn contentions in the Opposition Brief. Although portions of the depositions of Marcus and Parker have been submitted in connection with this motion, neither Marcus nor Parker has submitted an affidavit in connection with this case.

An explanation for the absence of affidavits from Marcus and Parker in this case may be the threat of sanctions under Rule 56(g) which provides:

> Should it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to this rule are presented in bad faith or solely for the purpose of delay, the court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused the other party to incur, including reasonable attorney's fees, and any offending party or attorney may be adjudges guilty of contempt.

Fed.R.Civ.P. 56(g). The absence of a Rule 56(f) affidavit (to establish necessity of additional discovery to oppose the motion) was discussed at oral argument. Counsel for Nevets conceded no such affidavit was submitted. Moreover, he did not request leave to file such an affidavit.

ter giving him authority to negotiate for NIAC and bind it to a settlement.

The 6 September 1985 Letter, which was signed by both parties, accurately set forth the discussions which took place on 29 August 1985 and expressly acknowledged that Nevets maintained its claims against NIAC.

On 15 December 1985, a subsequent meeting took place at which Parker submitted a claim of losses sustained by Nevets in excess of $500,000 due to the defective VCPs. Kakutani represented at that meeting that the defects in the VCPs had been corrected and the new line of machines would be excellent for the rental market. The 24 December 1985 Letter memorialized the terms of the 15 December meeting. It was accepted by Parker, although he contends he does not recall signing it. Parker's authority to sign the 24 December 1985 Letter and bind Nevets is not in dispute. Significantly, Parker does not deny signing the 24 December 1985 Letter. By contrast, Kakutani explicitly establishes he saw Parker sign the letter. Indeed, both Parker's signature and his authority to sign the letter were conceded by counsel to Nevets.

After Parker's signing of the 24 December 1985 Letter, Parker and Marcus called Kakutani, stating Nevets had not agreed to withdraw all claims against NIAC. In addition, Marcus sent a letter to Kakutani, on 27 December 1985, stating Nevets had not agreed to withdraw all claims against NIAC. Finally, on 12 March 1987, NIAC sent a letter to Parker, indicating NIAC would be bound by Kakutani's settlement of the "quality claim" and he was authorized to negotiate on behalf of NIAC.

The issue presented is whether the terms of the 24 December 1985 Letter constitute a legal bar to Nevets' claims and, if so, whether the attempts to modify the agreement create a genuine issue of material fact to preclude the grant of summary judgment.

### C. Settlement Agreement

#### 1. *The 24 December 1985 Letter*

■ The construction of an unambiguous term in a contract is "exclusively within the court." *Gray v. Joseph J. Brunetti Constr. Co.*, 266 F.2d 809, 893 (3d Cir.), *cert. denied,* 361 U.S. 826, 80 S.Ct. 74, 4 L.Ed.2d 69 (1959). *Accord Ram Constr. Co. v. American States Ins. Co.*, 749 F.2d 1049, 1053 (3d Cir.1984) ("When the question is one of 'construction' as distinguished from 'interpretation' of the contract, the issue is one of law."). Construction of a contract is defined as the process by which a contract is given a legal effect. *Ram Constr.*, 749 F.2d at 1053. As such, the construction of a contract's terms are a question of law.

■ The question whether a term is clear or ambiguous is also a question of law. *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 362 (3d Cir.1987); *Kroblin Refrigerated XPress, Inc. v. Pitterich*, 805 F.2d 96, 101 (3d Cir.1986). Ambiguity exists if the terms of the contract are susceptible to two reasonably alternative interpretations. *Mellon Bank v. Aetna Business Credit*, 619 F.2d 1001, 1011 (3d Cir.1980). The interpretation of ambiguous terms in a contract is generally a question of fact. *Ram Constr.*, 749 F.2d at 1052.

■ NIAC has argued the terms of the 24 December 1985 Letter are unambiguous and can be construed to give legal meaning to the agreement as a matter of law. In opposition, Nevets has asserted numerous examples of "obscure" or "ambiguous" terms which, it claims, cannot be interpreted as a matter of law.

Nevets' primary argument rests on the contention that certain parts of the 24 December 1985 Letter do not appear to be finalized. For example, Nevets argues paragraph five of the 24 December 1985 Letter, which relates to Parker's request that his television service company remain a Funai authorized service station, shows the parties intended to negotiate further on this point. Nevets quotes language in paragraph five which states Funai's representative requested "a few days to discuss the matter" with Funai executives. Plaintiff's Opposition Brief at 9. Moreover, Parker's request as recorded in the 25 Decem-

ber 1985 Letter asked that his company remain a Funai authorized service station for "as long as he wishes." *Id.* Nevets argues in its brief this matter was central to its negotiations with NIAC because agreement on Parker's request would permit Nevets to continue servicing the defective VCPs and to remain a viable company. Plaintiff's Opposition Brief, at 10.

Nevets claims the language of paragraph four of the 24 December 1985 Letter, which states Parker requested that NIAC resume "open credit" to Nevets after it made its payments to NIAC, was also material to Nevets and subject to further negotiation. Nevets argues no contract could have existed because negotiations were still pending on these issues. *Volk v. Atlantic Acceptance and Realty Co.*, 139 N.J.Eq. 171, 173, 50 A.2d 488 (1947), *aff'd mem.*, 141 N.J.Eq. 364, 57 A.2d 365 (1948).

Accepting Nevets' argument for purposes of this motion does not preclude the grant of summary judgment. Nevets ignores settled principles of contract law which permit parties to leave open terms in an agreement, subject to further negotiation in good faith. *Channel Home Centers v. Grossman*, 795 F.2d 291, 299 (3d Cir.1986) ("The jurisdictions that have considered the issue have held that [an agreement to negotiate in good faith], if otherwise meeting the requisites of a contract, is an enforceable contract."); J. Calamari & J. Perillo, *Contracts* § 2–9, at 63–64 (3d ed. 1987); Restatement (Second) of Contracts § 33, ill. 8. Indeed, the *Volk* case, which Nevets cited for its argument, states: "where the negotiations are in fact concluded and the contract is complete in all its essential and material terms and the parties intend it shall be obligatory, then it is enforceable, although it is deficient in the statement of those casual and incidental provisions commonly present in a formal and conventional agreement which the parties contemplate shall in due course be prepared and executed." *Volk*, 139 N.J.Eq. at 173, 50 A.2d 488.

The fourth and fifth paragraphs of the 24 December 1985 Letter were promises by the parties to negotiate further regarding the "open credit" and authorized service center issues. In fact, the 24 December 1985 Letter expressly provided NIAC's and Funai's representatives would respond to Parker's requests. These promises do not render the fourth and fifth paragraphs ambiguous simply because they were not then finalized.

Moreover, whatever uncertainty Nevets claims may have existed in the fourth and fifth paragraphs of the 24 December 1985 Letter, such was settled by the subsequent performance of the parties.[8] The 26 December 1985 Letter from Kakutani to Parker stated Parker's business would remain an authorized Funai service center. The agreement was not only accepted and confirmed by Parker, it was the product of mutual agreement because two of the four substantive paragraphs in the letter were handwritten and initialled. One of these handwritten paragraphs stated the agreement would last a minimum of one year. Plaintiff's Opposition Brief, Exhibit B.

Additionally, NIAC resumed "open credit" to Nevets after the completion of the required payments by Nevets. Thus, the open terms of the 24 December 1985 Letter which were subject to further negotiation were in fact finalized within a few days. Any ambiguity which may have existed was thereby made definite by the subsequent performance of the parties. *See, e.g., Michaels v. Brookchester, Inc.*, 26 N.J. 379, 388, 140 A.2d 199 (1958) ("Where ambiguity exists, the subsequent conduct of the parties in the performance of the agreement may serve to reveal their original understanding"); *Joseph Hilton & Assoc. v. Evans*, 201 N.J.Super. 156, 171, 492 A.2d 1062 (App.Div.1985) ("the conduct of the parties after execution of the contract is entitled to great weight in determining its meaning").

A general policy of contract law requires that the contract be construed as a

---

**8.** Nevets acknowledges this fact when it states basic terms in the 24 December 1985 Letter "are finalized in a later agreement (see 26 December 1985 Service Agreement....)" Plaintiff's Opposition Brief at 7.

whole whenever possible. *Ludwig Honold Mfg. Co. v. Fletcher,* 405 F.2d 1123, 1131 (3d Cir.1969); *Bell v. Purolator Products, Inc.,* 1989 WL 99024, 1989 U.S.Dist. LEXIS 9822, *14 (E.D.Pa. Aug. 16, 1989); *Wheatly v. Sook Suh,* 217 N.J.Super. 233, 239, 525 A.2d 340 (App.Div.1987). A contract must be construed to render performance possible, unless a construction which renders performance impossible is absolutely necessary. *Fletcher,* 405 F.2d at 1131. In this case, the claim by Nevets that ambiguities in paragraphs four and five of the 24 December 1985 Letter render the entire agreement unenforceable is unavailing. Taken as a whole, the 24 December 1985 Letter exhibits a definite and complete agreement between the parties to be bound by its terms.

■ To be enforceable, a contract must be sufficiently definite in its terms to ascertain with reasonable certainty the performance to be rendered by each of the parties. *Friedman v. Tappan Dev. Corp.,* 22 N.J. 523, 531, 126 A.2d 646 (1956). The words used in a contract must be given their "plain and ordinary meaning." *Independent Oil Workers at Paulsboro, N.J. v. Mobil Oil Corp.,* 441 F.2d 651, 653 (3d Cir.1971). Certain terms, however, will be considered in the context in which the agreement was drafted:

> Trade terms, legal terms of art, numbers, common words of accepted usage and terms of a similar nature should be interpreted in accord with their specialized or accepted usage unless such an interpretation would produce irrational results or the contract documents are internally inconsistent.

*Mellon Bank,* 619 F.2d at 1013.

Paragraph two of the 24 December 1985 Letter, which states NIAC would provide Nevets with five hundred new VCPs in compensation for Nevets' losses caused "by the malfunction and defects of some of VP–1500 (earlier version)," is also unambiguous. Nevets argues, to the contrary, " 'some' does not constitute 'all,' so this section is ambiguous as to how to interpret the function and import of the 500 new machines." Plaintiff's Opposition Brief at 12. However, this argument does not present a genuine issue of material fact. The second paragraph unambiguously stated NIAC would provide Nevets with five hundred VCPs to compensate for losses suffered as a result of the alleged defects. It must be remembered the parties were trying to and did resolve a controversy. This was a negotiated settlement agreement of disputed issues.

Nevets has not proposed any alternative interpretation of paragraph two but has simply claimed it would be more definite if it stated NIAC would replace "all" the defective VCPs. There is, however, no evidence in the 24 December 1985 Letter or any other submission in connection with this motion which suggests NIAC promised to replace more than five hundred of the defective VCPs purchased by Nevets. The parties settled their dispute by agreeing NIAC would provide five hundred new machines for losses occasioned by some but not all of the allegedly defective VCPs. This arrangement avoided a continuing dispute over how many VCPs were defective and the extent of the defect each VCP suffered. That the parties agreed NIAC would compensate Nevets for some but not all of the defective machines does not render the settlement vague. By definition, in settling each party compromises its claims or position. The parties are "bound by the appropriate objective definition of the words they use to express their intent." *Mellon Bank,* 619 F.2d at 1013.

Moreover, taking the 24 December 1985 Letter as a whole, it is apparent the parties intended it to be a complete and binding settlement agreement. The second paragraph appears directly after paragraph one of the 24 December 1985 Letter which sets out the payment schedule Nevets would meet in resolution of NIAC's claim against it. Additionally, paragraph three adds that Nevets would "withdraw" its claim against NIAC and NIAC would "not make any claim to Nevets C.M., Inc. on this matter."

Taken together, paragraphs one, two and three of the 24 December 1985 Letter set up a simple settlement agreement to compromise and resolve the dispute between

the parties. Under paragraph one, Nevets agreed to pay the money owed to NIAC under a definite schedule. Under paragraph two, NIAC agreed to supply Nevets with five hundred new VCPs. Finally, both parties agreed, under paragraph three, not to pursue their respective claims further. All these conditions (*i.e.,* payment by Nevets, replacement by NIAC, and withdrawal of NIAC's claims) have been satisfied by the parties' performance, with the exception of the withdrawal of this action by Nevets. In addition, the portions of the agreement left open to further negotiation were made definite and accepted by the subsequent performance of the parties pursuant to the agreement.

Nevets' arguments in opposition to these conclusions are unpersuasive. Although Nevets questions the meaning of the term "this matter" as used in paragraph three, Nevets has failed to show it is ambiguous. When read in context of paragraphs one and two, "this matter" clearly refers to NIAC's claim against Nevets for $189,-961.11 and Nevets' claim against NIAC for the losses incurred on the defective VCPs. Neither party has presented any evidence showing "this matter" could refer to any other dispute between the parties. To the contrary, the record shows these claims were the only disputes between Nevets and NIAC at the time. As well, counsel to Nevets conceded at oral argument there were no other disputes between the parties at the time the 24 December 1985 Letter was signed and accepted by Nevets and NIAC. Accordingly, the 24 December 1985 Letter constitutes a complete, unambiguous and binding settlement agreement which operates to preclude this action by Nevets.

### 2. The 27 December 1985 Letter

■ Assuming it is true the 27 December 1985 Letter was mailed to and received by NIAC, Nevets' argument that it displays an intent not to be bound by the 24 December 1985 Letter is also unpersuasive. Nevets has not shown a lack of intent by Parker when he signed the 24 December 1985 Letter. Nevets does not create even "metaphysical doubt" by its submissions.

*Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355. As the Supreme Court has held with regard to a defendant's motion for summary judgment, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512. The submissions in this case do not even equal the insufficient "scintilla" standard.

The unsworn contentions presented by Nevets in opposition to this motion are little more than a smoke screen, which does not present a genuine issue of material fact to deny NIAC's motion for summary judgment. Nevets has in fact refrained from arguing Parker's lack of memory bears on the construction of the 24 December 1985 Letter; the brief filed in opposition to this motion nowhere claims Parker's lack of memory renders the 24 December 1985 Letter unenforceable. Instead, Nevets has relied solely on its argument that the 24 December 1985 Letter is too ambiguous to be construed as a binding agreement.

■ The fact that the 24 December 1985 Letter is unambiguous and constitutes a binding settlement agreement cannot be neutralized by Nevets' claim that the 27 December 1985 Letter raised an issue with respect to the parties' intent to bind Nevets by the 24 December 1985 Letter. Even if Parker subjectively intended not to be bound by the 24 December 1985 Letter when he signed it (a contention not established by affidavit or otherwise), the outward manifestation of his intent to bind Nevets by signing the agreement cannot be undone, in the absence of fraud, mistake, duress or some other contract defense. *See Zapanta v. Isoldi,* 212 N.J.Super. 678, 687, 515 A.2d 1298 (1986) ("Motivations or mental reservations cannot affect a written agreement. If they were permitted to do so, a written agreement would be worthless and the source of much litigation."); *see also Dome Petro., Ltd. v. Employers Mut. Liability Ins. Co.,* 767 F.2d 43, 42 (3d Cir.1985) (interpretation of contract depends not on "discovery of undisclosed intent," but on manifestation of intent in

language of contract and surrounding circumstances); *Mellon Bank*, 619 F.2d at 1009 (parties bound by terms of their contract absent illegality, unconscionableness, fraud, duress or mistake); J. Calamari & J. Perillo, *supra*, § 2–2 (discussion on "objective theory of contracts"). A subsequent change of mind does not bear on the validity or existence of the original agreement.

As such, the 27 December 1985 Letter could only be seen as an attempt to modify the terms of the 24 December 1985 Letter. An attempt to modify an existing agreement must be supported by new consideration. *Barnhart v. Dollar Rent A Car Sys.*, 595 F.2d 914, 919 (3d Cir.1979) (Pennsylvania law); *Ross v. Orr*, 3 N.J. 277, 281–82, 69 A.2d 730 (1949). Nevets has not argued the 27 December 1985 Letter was supported by new consideration and there is nothing in the letter to suggest consideration existed. Indeed, there is nothing to suggest, much more establish, the modification or recission of the 24 December 1985 Letter which Nevets suggests was effected by the 27 December 1985 Letter. The 24 December 1985 Letter is a valid, enforceable contract and operates to bar this action by Nevets.

D. Release

NIAC has further argued the 24 December 1985 Letter constitutes a release by Nevets of its claim against NIAC regarding the defective VCPs. Nevets has argued, without submitting an affidavit or other competent submission, there is a factual issue whether Parker willingly and knowingly accepted the terms of the 24 December 1985 Letter. Additionally, Nevets argues there was disagreement as to the scope of the release and neither party thought a conclusive settlement was established by the 24 December 1985 Letter.

Once again, it is important to note there is no dispute as to the genuineness of or authority for Parker's signature on the 24 December 1985 Letter. Essentially, Nevets does not argue Parker unwillingly and unknowingly accepted the terms of the 24 December 1985 Letter on behalf of Nevets. The general rule in New Jersey is:

where a party affixes his signature to a written instrument, such as a release, a conclusive presumption arises that he or she read, understood and asserted to its terms and will not be heard to complain that the affect of the act of signing was not comprehended.

*Borbely v. Nationwide Mut. Ins. Co.*, 547 F.Supp. 959, 977 (D.N.J.1981) (quoting *Van Houten Service, Inc. v. Shell Oil Co.*, 417 F.Supp. 523, 527 (D.N.J.1975), *aff'd mem.*, 546 F.2d 421 (3d Cir.1976). A release is binding and will be enforced according to the terms the releasor "willingly and knowingly" accepted. *Raroha v. Earle Finance Corp., Inc.*, 47 N.J. 229, 234, 220 A.2d 107 (1966).

In executing the 24 December 1985 Letter, Parker willingly and knowingly accepted the terms of paragraph three, which stated Nevets agreed to withdraw its claims against NIAC. All Nevets contends is that a few days after reviewing the 24 December 1985 Letter, Marcus and Parker expressed some dissatisfaction with it. This does not raise a genuine issue of material fact with regard to whether the agreement was binding when it was signed. The 26 December 1985 Letter, which finalized the authorized service center portion of the 24 December 1985 Letter, was confirmed by Parker before the 27 December 1985 Letter was sent. In addition, NIAC resumed "open credit" to Nevets as called for by the 24 December 1985 Letter. Thus, there existed a final and complete settlement agreement before the 27 December 1985 Letter was sent.

In addition, Nevets' argument that the interpretation of the terms "this matter" as used in the 24 December 1985 Letter cannot be determined as a matter of law is misguided. The case upon which Nevets relies in making this argument, *Novak v. General Electric Corp.*, 282 F.Supp. 1010 (E.D.Pa.1967), is distinguishable from the present case because in that case the defendant was asserting that a general release precluded it from asserting claims which were unknown at the time of the execution of the release. *Id.* at 1021–23. In the present case, Nevets is asserting the release did not apply to a claim existing and known to the parties at the time the release

was signed. Thus, the issue can be decided as a matter of law. Because, as discussed above, the term "this matter" related to the instant claim, the 24 December 1985 Letter acted as a release of Nevets' claim against NIAC.

### E. Accord and Satisfaction

▬▬ An accord and satisfaction is an agreement which, upon its execution, completely terminates a party's existing rights and constitutes a defense to any action to enforce pre-existing claims. J. Calamari & J. Perrillo, *supra,* § 4–11 at 214–215. An accord is an agreement whereby one party agrees to make some performance in exchange for extinguishment of a debt or other obligation; execution of an accord constitutes a satisfaction and extinguishes the debt. *Id.*

In New Jersey there are three elements to an accord and satisfaction:

> (a) a bona fide dispute as to the amount owed; (b) a clear manifestation of intent by the debtor to the creditor that payment is in satisfaction of the disputed amount; and (c) acceptance of satisfaction by the creditor.

*Loizeaux Builders Supply Co. v. Donald B. Ludwig Co.,* 144 N.J.Super. 556, 564–65, 366 A.2d 721 (L.Div.1976) (citing *United States for use of Glickfeld v. Krendel,* 136 F.Supp. 276, 282 (D.N.J.1955)); *A.G. King Tree Surgeons v. Deeb,* 140 N.J.Super. 346, 348–49, 356 A.2d 87 (1976).

▬▬ In this case, all three elements of an accord and satisfaction are present. According to Nevets' own allegations at the 15 December 1985 meeting it presented a claim to NIAC for over $500,000 in losses attributable to the allegedly defective VCPs. At the same time, however, NIAC was asserting Nevets owed more than $189,000 for the purchase of the VCPs. These conflicting claims establish there was a dispute between the parties over the amounts owed.

Additionally, the 24 December 1985 Letter establishes a clear manifestation of intent that the exchange of consideration would settle the disputes between the parties. In exchange for Nevets' promise to pay $189,961.11, NIAC would forego making any claim against Nevets "on this matter." Both of these conditions were fulfilled. Similarly, in exchange for NIAC's promise to provide five hundred refurbished VCPs, to resume "open credit" to Nevets and to retain Parker's business as an authorized service center (all of which were satisfied), Nevets would agree to withdraw his claim against NIAC. There is no dispute that Nevets at that time had asserted a claim against NIAC for damages due to the defective VCPs. Thus, the clear manifestation of intent in making these promises was to satisfy the existing claims.

Finally, all the conditions of the accord were satisfied by each party. Nevets paid the money it owed to NIAC and accepted the benefits of all the promises made by NIAC. As to Nevets' assertion that the five hundred VCPs received in satisfaction of Nevets' claim were defective as well, Plaintiff's Opposition Brief at 18, it is instructive to note there have been no affidavits submitted in support of that allegation. Nevets also does not support its allegation with reference to *any* fact in the record. In opposing a motion for summary judgment, a party must support its allegations with specific facts:

> Rule 56(e) requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file" designate "specific facts showing that there is a genuine issue for trial."

*Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553. Thus, Nevets' unsupported assertion (on this point and on other points in the opposition) cannot defeat NIAC's motion for summary judgment, especially in light of the evidence and sworn affidavits provided by NIAC.

### Conclusion

For the reasons set forth above, NIAC's motion for summary judgment is granted.

SO ORDERED.