**THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA,**
Plaintiff,

v.

**Donna M. GODUTI–MOORE, individually and as Executrix of the Estate of Kevin H. Moore, Defendant,**

**Donna M. Goduti–Moore,**
**Counter–Claimant,**

v.

**The Guardian Life Insurance Company of America, Counter–Defendant,**

**Donna M. Goduti–Moore, Third–Party Plaintiff,**

v.

**Robert Beckett and National Pension Consultants, Third–Party Defendants.**

Civil Action No. 97–1418(MLC).

United States District Court, D. New Jersey.

Jan. 29, 1999.

Steven P. Del Mauro, Del Mauro, Digiaimo & Knepper, P.C. Morristown, NJ, for Plaintiff.

Donald R. Belsole, Belsole & Kurnos, L.L.C., Morristown, NJ, for Defendant.

Jonathan S. Reed, Traub, Eglin, Lieberman, Straus, Hackensack, NJ, for Third–Party Defendants.

## MEMORANDUM OPINION

COOPER, District Judge.

This matter comes before the Court on cross-motions for summary judgment by plaintiff The Guardian Life Insurance Company of America ("Guardian–Life"), defendant Donna M. Goduti–Moore ("Goduti–Moore"), and third-party defendants Robert Beckett and National Pension Consultants ("NPC"). For the reasons stated, plaintiff's motion for summary judgment is granted, defendant's motion for summary judgment is denied as moot, and third-party defendants' motion for summary judgment is granted.

### BACKGROUND

On October 4, 1994, Guardian Life, a New York company, issued a life insurance policy ("the Policy") in the amount of $500,000 to decedent Kevin Moore ("Moore"), a New Jersey resident. (*See* Certif. of Janemary S. Belsole, Esq. dated 5–29–98 ("Belsole Certif."), Ex. 6: the Policy.) Third-party defendant and insurance broker Robert Beckett ("Beckett") procured the Policy which named

Moore's wife, defendant Goduti–Moore, as the primary beneficiary. (*Id.* at I.)[1]

Moore initially applied to pay the insurance premium on an annual basis. (*Id.* at J.) The Policy allowed a change in payment frequency but required that the change "result in a premium falling due on each policy anniversary." (*Id.* at O.) The Policy stated that any premium not paid on its due date would be in default. (*Id.*) However, the Policy also contained a 31–day grace period and stated that the Policy would not lapse if payments were made within that time. (*Id.*) The Policy identified the policy date as October 4, 1994 and stated that "[p]olicy years, policy months, and policy anniversaries are measured from the policy date." (*Id.* at C, T.)

On October 25, 1994, Moore executed a "Request for Guard–O–Matic Premium Arrangement Form" by which Moore enabled Guardian Life to draw checks against Moore's checking account on a monthly basis to pay the Policy premium. (*Id.*, Ex. 10.) Moore signed a form stating: "If the Guard–O–Matic premium arrangement is terminated, premiums falling due thereafter shall be payable directly to the Company monthly at the monthly premium rate which would have been applicable to the policy if it had not been placed under the Guard–O–Matic premium arrangement." (*Id.* at A.)

Moore also issued a check to Guardian Life on October 31, 1994 in the amount of $366 as an initial premium payment. (*Id.*, Ex. 33.) On November 4, 1994, Guardian Life sent Moore a policy statement which divided the $366 payment into payments of $122.31 for the periods from October 4, 1994 to November 4, 1994, November 4, 1994 to December 4, 1994, and December 4, 1994 to January 4, 1995. (*Id.*, Ex. 11.) The policy statement also noted: "Starting January 1995, on or about the 15th of each month, a withdrawal of $122.31 will be made automatically for this policy." (*Id.*) Guardian Life withdrew $122.31 on the 15th of each month unless the 15th fell on a Saturday, Sunday, or legal holiday in which case the money was withdrawn on the following business day. (*See* Aff. of Robert Ryan dated 5–22–98 ("Ryan Aff.") ¶ 10.) On September 15, 1995, Guardian sent Moore a policy statement announcing that Guardian Life would collect $129.61 as the monthly premium beginning in October 1995. (Belsole Certif., Ex. 12.)

It is undisputed that Guardian Life was unable to withdraw the amount of $129.61 from Moore's bank account on August 15, 1996. (*See* Pl.'s Br. in Supp. at 24; Def.'s Br. in Supp. at 9.) On August 20, 1996, Guardian Life received notification from its collecting bank that the electronic transfer debit had been returned because Moore's account had been closed. (Ryan Aff. ¶ 12.) Guardian Life consequently issued a policy statement on August 21, 1996 to Moore that read:

THE DETAILS OF A TRANSACTION ON YOUR POLICY ARE SHOWN BELOW
REMOVAL FROM GUARD–O–MATIC
YOUR AUGUST GUARD–O–MATIC PREMIUM WAS RETURNED FOR ACCOUNT CLOSED.
METHOD OF PAYMENT CHANGED TO REGULAR BILLING

| | | |
|---|---|---|
| FUNDS TO BE USED | | 129.61 |
| REVERSAL OF PREMIUM FROM | 09/04/96 TO 08/04/96 | 129.61 |
| PREMIUMS ARE PAID TO | 08/04/96 | |
| PREMIUM DUE | 08/04/96 | $133.50 |
| PREMIUM DUE | 09/04/96 | $133.50 |
| AMOUNT DUE | | $267.00 |

(Belsole Certif., Ex. 16.)

Kevin Moore died on September 5, 1996 as the result of a car accident. (*Id.*, Ex. 27.)

---

1. The Belsole Certification is our primary reference for the exhibits discussed in this Memorandum and Order. Every page of each exhibit contained in the Belsole Certification is identified by letter. We will consequently cite to the appropriate exhibit and corresponding letter.

On November 6, 1996, Guardian Life informed Goduti–Moore that the Policy had lapsed and that Guardian Life therefore rejected her claim for proceeds. (*Id.*, Ex. 32.) Guardian Life argues that the 31–day grace period expired on September 4, 1996, one day before Moore's death. (Pl.'s Br. in Supp. at 25.)

Guardian Life filed a Complaint on March 7, 1997 against Goduti–Moore seeking a declaration of the parties' rights and obligations under the Policy. (Compl.¶ 25.) Goduti–Moore filed a Counterclaim, also seeking a declaration of rights. (*See* Counterclaim, Am. Counterclaim.)[2] In addition, Goduti–Moore alleges that insurance broker Robert Beckett and his agency NPC breached a duty to keep Moore informed as to the status of the Policy. (*See* Third–Party Compl., Am. Third–Party Compl.) Guardian Life and the third-party defendants have filed cross-claims against each other for contribution and indemnification.

Both Guardian Life and Goduti–Moore have moved for summary judgment on their claims against each other. Beckett and NPC have also moved for summary judgment on the claims filed against them by Goduti–Moore and the cross-claims filed by Guardian Life. We heard oral argument concerning these pending motions on October 30, 1998.

## DISCUSSION

Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court noted that Rule 56(c) asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Summary

judgment is appropriate where there is no genuine issue of material fact in the case which requires a trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### I. Summary Judgment Motions By Guardian Life and Goduti–Moore

We will begin our analysis with the summary judgment motions by Guardian Life and Goduti–Moore. Guardian Life argues that it is entitled to summary judgment because the Policy lapsed due to the nonpayment of the August 4, 1996 premium and the expiration of the resulting grace period. (*See* Pl.'s Br. in Supp. at 30.) Goduti–Moore argues that the insurance premium fell due on a later date. (Def.'s Br. in Supp. at 17.) She notes that August 4, 1996 was a Sunday and argues that the grace period therefore did not begin to run until Monday, August 5, 1996. (*Id.* at 18.) Alternatively, Goduti–Moore argues that: (1) Guardian Life's use of the Guard–O–Matic system created a premium due date of August 15, 1996, or (2) the August 21, 1996 policy statement created a premium due date of August 21, 1996. Under a premium due date of August 5, 15, or 21, Moore would have died within the 31–day grace period and the Policy would not have lapsed. Finally, Goduti–Moore argues that, under New York law, a life insurance policy cannot lapse unless the insurance company provides notice at least fifteen days before payment of the premium is due and that Guardian Life did not provide the required notice. (*Id.* at 34) (citing N.Y. Ins. Law § 3211.)

 Our first task is to address the choice-of-law question presented by Moore's residency in New Jersey and Guardian Life's location in New York. As a federal court sitting in diversity jurisdiction, this Court applies the choice-of-law rules of New Jersey, our forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under choice-of-law principles, however, where the laws of

---

2. Goduti–Moore filed a document entitled "Amended Counterclaim and Third–Party Complaint" on November 18, 1997. The document referred back to and incorporated the allegations

of the previous Counterclaim and Third–Party Complaint. We consequently cite to both documents when appropriate.

the two jurisdictions would produce the same result, there is a "false conflict," and a court should avoid the choice-of-law question. *See Williams v. Stone,* 109 F.3d 890, 893 (3d Cir.1997); *Polar Int'l Brokerage v. Investors Ins.,* 967 F.Supp. 135, 141 (D.N.J.1997). Our conclusion that Guardian Life's summary judgment motion would succeed under the law of either New York or New Jersey precludes our analysis of the choice-of-law question.[3]

 We will now explain the relevant contract principles underlying our analysis. The court determines whether a contract term is ambiguous. *See Nester v. O'Donnell,* 301 N.J.Super. 198, 210, 693 A.2d 1214, 1219 (App.Div.1997); *Horn v. Mazda Motor of Am.,* 265 N.J.Super. 47, 60 n. 5, 625 A.2d 548, 555 (App.Div.1993); *Kaufman v. Provident Life & Cas. Ins. Co.,* 828 F.Supp. 275, 282–83 (D.N.J.1992) ("Construction of contracts is a question of law."), *aff'd,* 993 F.2d 877 (3d Cir.1993). A contract is ambiguous if its terms "are susceptible to at least two reasonable alternative interpretations." *Kaufman,* 828 F.Supp. at 283; *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1011 (3d Cir.1980). In determining whether an ambiguity exists, New Jersey law permits us to consider "the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation." *American Cyanamid v. Fermenta Animal Health Co.,* 54 F.3d 177, 181 (3d Cir.1995) (applying New Jersey contract law). A contract term which is unambiguous when accorded the commonly understood meaning of its words cannot be disregarded unless the extrinsic evidence is such as might cause a reasonable fact finder to understand the text differently. *American Cyanamid,* 54 F.3d at 182.

 If a contract is determined to be unambiguous, the construction of the written agreement is a matter of law to be decided by the court. *Michaels v. Brookchester, Inc.,* 26 N.J. 379, 387, 140 A.2d 199, 203 (1958). However, where the meaning of a contract provision is "uncertain or ambiguous and depends upon parol evidence admitted in aid of

interpretation, the meaning of the doubtful provision should be left to the jury." *Garden State Buildings v. First Fidelity Bank,* 305 N.J.Super. 510, 525, 702 A.2d 1315, 1323 (App.Div.1997) (quoting *Michaels,* 26 N.J. at 387, 140 A.2d at 203).

 Certain principles apply in the context of insurance contracts. "As contracts of adhesion, such policies are subject to special rules of interpretation." *Longobardi v. Chubb Ins. Co.,* 121 N.J. 530, 537, 582 A.2d 1257, 1260 (1990). Thus, the New Jersey Supreme Court instructs that "policies should be construed liberally in [the insured's] favor to the end that coverage is afforded to the full extent that any fair interpretation will allow." *Id.; Kaufman,* 828 F.Supp. at 283. Notwithstanding that premise, "[w]here the terms of an [insurance] contract are clear and unambiguous, there is no room for interpretation or construction and [the court] must enforce those terms as written." *Levison v. Weintraub,* 215 N.J.Super. 273, 276, 521 A.2d 909, 910 (App.Div. 1987); *see also Longobardi,* 121 N.J. at 537, 582 A.2d at 1260 (court cannot engage in "a strained construction to support imposition of liability"); *Scarfi v. Aetna Cas. & Surety Co.,* 233 N.J.Super. 509, 514, 559 A.2d 459, 462 (App.Div.1989) (same); *Zapanta v. Isoldi,* 212 N.J.Super. 678, 687, 515 A.2d 1298, 1302 (Ch.Div.1986) ("The parties are bound by the intentions they express in their writing so long as that writing is complete and unambiguous on its face....").

 With these contract principles in mind, we find that the Policy unambiguously created a premium due date falling on the 4th of the month. The Policy stated that any change apart from an annual payment "must result in a premium falling due on each policy anniversary." (Belsole Certif., Ex. 6 at O.) The Policy identified the policy date as October 4, 1994 and stated that "[p]olicy years, policy months, and policy anniversaries are measured from the policy date." (*Id.* at C, T.)

Communications from Guardian Life to Moore continued to reflect that the premium

---

**3.** We note that both parties agree that a conflict does not exist between the laws of the two states on the relevant issues in this matter. (*See* Pl.'s Br. in Supp. at 29; Def.'s Reply Br. at 4.)

due date fell on the 4th. The November 4, 1994 policy statement divided the $366 initial premium payment into payments of $122.31 for the periods identified as October 4, 1994 to November 4, 1994, November 4, 1994 to December 4, 1994, and December 4, 1994 to January 4, 1995. (*Id.*, Ex. 11.) The August 21, 1996 policy statement sent after the failure of the automatic withdrawal also stated that premiums were paid to "08/4/96" but that a premium was due "08/04/96" and that another was due "09/04/96." (*Id.*, Ex. 16.) Accordingly, we rule that under the plain terms of the Policy, Moore owed a premium payment due August 4, 1996.

We also find that the Policy had lapsed at the time of Moore's death. The Policy stated that any premium that is not paid on its due date is in default. (*Id.*, Ex. 6.) It is undisputed that Moore did not make a payment before his death and that the premium was in default. The Policy also contained a 31-day grace period and stated that the Policy would lapse if payments were not made within that time. (*Id.* at O.) We have found that the premium due date was August 4, 1996, and the 31-day grace period therefore expired on September 4, 1996. Thus, at the time of Moore's death on September 5, 1996, the Policy had lapsed.[4]

■ We find Goduti–Moore's arguments to be without merit. She notes that August 4, 1996 was a Sunday and therefore argues that the grace period did not begin to run until Monday, August 5. (Def.'s Br. in Supp. at 18.) It is true that if the grace period had expired on a weekend or holiday, it would have been extended to the next business day. *See Bohles v. Prudential Ins. Co.*, 84 N.J.L. 315, 316, 86 A. 438, 439 (Err.& App.1913). However, the day on which the grace period ended was a business day (Wednesday, September 4, 1996) and thus the grace period should not be extended. *Cf. Burgess v. Long Island R.R. Auth.*, 79 N.Y.2d 777, 579 N.Y.S.2d 631, 587 N.E.2d 269 (N.Y.1991) (period of one year and 30 days in which passenger had to commence action was not extend-

ed by three days by fact that passenger was injured on Friday night and could not present his claim to the claims bureau until the following Monday, three days later).

We also reject Goduti–Moore's argument that Guardian Life's use of the automatic monthly payment system created a premium due date of the 15th of the month. The November 4, 1994 policy statement announced that Guardian Life would automatically withdraw money on the 15th of the month. (*See* Belsole Certif., Ex. 11 at A.) However, the policy statement also stated that the initial premium payment had been divided to cover three payment periods, all with the premium due date as the 4th of the month. (*Id.*, Ex. 11 at A.) The policy statement thus reaffirmed that the premium due date fell on the 4th. Moreover, the Policy, which had been issued a month earlier, stated that changes in payment frequency "must result in a premium falling due on each policy anniversary" and that "policy anniversaries are measured from the policy date," identified as October 4, 1994 in the Policy. (*Id.*, Ex. 6 at C, T.)

■ Guardian Life's withdrawal of premium payments on the 15th of the month did not create a waiver of the premium due date. It is true that, in some jurisdictions, a pattern of accepting premiums beyond the end of the grace period could constitute a waiver of forfeiture of a policy. *See Horace Mann Life Ins. Co. v. Lunsford*, 172 Ga.App. 866, 324 S.E.2d 808, 811 (1984). However, neither New York nor New Jersey has adopted this rule. *See Brecher v. Mutual Life Ins. Co. of N.Y.*, 120 A.D.2d 423, 501 N.Y.S.2d 879, 882 (App.Div.1986) ("It is a cardinal rule that an insurer's voluntary, repeated acceptance of late payment of premium, neither binds it to accept those overdue at the time of an insured's death after the grace period under the policy has expired, nor entitles the beneficiary to invoke the doctrines of waiver or estoppel."); *Sugarman v. Equitable Life Assur. Soc.*, 7 N.J.Su-

---

4. We are not unmindful that if Moore had died one day earlier, Goduti–Moore would have been entitled to the insurance benefits. However, a court cannot engage in "a strained construction to support imposition of liability." *See Longo-*

*bardi*, 121 N.J. at 537, 582 A.2d at 1260; *see also Kampf v. Franklin Life Ins. Co.*, 33 N.J. 36, 44, 161 A.2d 717, 721 (1960) (holding that the grace period expired one day before insured's death).

per. 379, 382, 71 A.2d 148, 149 (Ch.Div.1950), *aff'd,* 5 N.J. 382, 75 A.2d 822 (1950) (finding that the acceptance of 3 out of 19 premium payments outside the expiration of the grace period did not create a waiver).

In the instant case, Guardian Life never accepted a premium payment beyond the expiration of the grace period. The withdrawal of premium payments on the 15th of the month, during the grace period, simply does not give rise to a claim of estoppel or waiver. *See Couch on Insurance* § 78:27 (3d ed. 1996) ("[E]ven repeated acceptance of payments within the grace period can induce no reasonable belief upon the part of the insured that forfeiture may be postponed beyond such extension period; moreover, such a custom carries no implication either that there is no limit of the time when payment may be made, or that it is somewhere beyond the limit established by the contract.").

■ Goduti–Moore's argument that the August 21, 1996 policy statement commenced the 31–day grace period is also flawed. She argues that the policy statement advised Moore that there was an amount due of $267 but did not tell him when to pay it or advise that the Policy would lapse. (Def.'s Br. in Supp. at 30.) However, the statement clearly stated that there was a premium due "08/04/96" of $133.50. (Belsole Certif., Ex. 16.) We find that the statement was not misleading so as to create a waiver of the August 4, 1996 premium due date.

■ We are also unpersuaded by Goduti–Moore's argument that the announcement in the August 21, 1996 policy statement that the premium due on the 4th was $133.50, instead of the $129.61 withdrawn under the automatic system, established a new premium with a new due date. The "Request for Guard–O–Matic Premium Arrangement Form," signed by Moore, clearly stated: "If the Guard–O–

Matic premium arrangement is terminated, premiums falling due thereafter shall be payable directly to the Company monthly at the monthly premium rate which would have been applicable to the policy if it had not been placed under the Guard–O–Matic premium arrangement." [5] (*Id.,* Ex. 10 at A.) Accordingly, we find that the addition of less than four dollars to the premium, as a result of the termination of the automatic withdrawal system and as agreed to by Moore, did not alter the premium due date.

■ Finally, Goduti–Moore mistakenly argues that the Policy could not lapse because Guardian Life did not send an appropriate warning notice to Moore. (*See* Def.'s Br. in Supp. at 34.) Under New York law, a life insurance policy cannot lapse unless the insurance company provides notice to the insured at least fifteen days before payment of premium is due. *See* N.Y. Ins. Law § 3211. However, the statute does not apply if the premiums are due monthly. *Id.* § 3211(f)(2); *Brecher,* 501 N.Y.S.2d at 882 (holding that automatic withdrawal of premium payments from bank account on a monthly basis fell within the exception to the statute). In addition, a New York insurer does not have to provide notice to an insured living in another state. *See Kaplan v. The Equitable Life Assur. Soc. of the U.S.,* 177 Misc. 792, 31 N.Y.S.2d 972, 975 (N.Y.Sup.Ct. 1940), *aff'd* 261 A.D. 1067, 27 N.Y.S.2d 780 (N.Y.App.Div.1941).

Accordingly, we will grant the summary judgment motion by Guardian Life, and the summary judgment motion by Goduti–Moore is therefore moot. We will next examine the summary judgment motion brought by third-party defendants Beckett and NPC.[6]

## II. Summary Judgment Motion by Beckett and NPC

dants argue that the laws of New York and New Jersey do not conflict on the issues in dispute. (*See* Third–Party Defs.' Br. in Supp. at 11.) Our determination that the motion for summary judgment by the third-party defendants would succeed under the law of either state again precludes us from having to address the choice-of-law question. *See Williams,* 109 F.3d at 893.

---

**5.** Guardian Life has explained that it slightly discounts monthly premiums paid through automatic withdrawal. (*See* Supplemental Aff. of Robert P. Ryan dated 6–23–98 ¶ 14.)

**6.** Goduti–Moore argues that we should apply New York law to the dispute between her and the third-party defendants. (*See* Third–Party Pl.'s Br. in Opp'n at 24–25.) The third-party defen-

Goduti–Moore alleges that Beckett[7] breached his duty as a broker to keep Moore informed of pertinent information with respect to his policies with Guardian Life. (Third–Party Compl. ¶ 57.) In particular, Goduti–Moore alleges that Beckett had a duty to provide notice to Moore that the Policy was lapsing. (*Id.* ¶¶ 57, 62, 69.) Goduti–Moore also alleges that Beckett violated his Field Representative Agreement with Guardian Life and that Moore was a third-party beneficiary of said agreement. (Am. Third–Party Compl. ¶¶ 93, 101.)

> Under New Jersey law,
>
> one who holds himself out to the public as an insurance broker is required to have the degree of skill and knowledge requisite to the calling. . . . If he neglects to procure the insurance or if the policy is materially deficient . . . because of his failure to exercise the requisite skill or diligence, he becomes liable.

*Glezerman v. Columbian Mut. Life Ins. Co.*, 944 F.2d 146, 149 (3d Cir.1991) (quoting *Rider v. Lynch*, 42 N.J. 465, 475, 201 A.2d 561, 567 (1964)). Brokers have been found liable for failing to procure the requested coverage. *See, e.g., Brill v. Guardian Life Ins. Comp. of America*, 142 N.J. 520, 544, 666 A.2d 146, 158 (1995). However, under New York law, a broker does not have a duty "to advise, guide or direct an insured's coverage after a broker has complied with his obligation to obtain insurance coverage on behalf of an insured." *Blonsky v. Allstate Ins. Co.*, 128 Misc.2d 981, 491 N.Y.S.2d 895, 897 (N.Y.Sup. Ct.1985). Thus, under New York law, Beckett did not have a duty to alert Moore that the Policy would lapse if he did not pay the premium due on August 4, 1996.

In New Jersey, a special relationship between the broker and the insured may create additional responsibilities on the part of the broker beyond exercising the requisite skill in procuring insurance. *Glezerman*, 944 F.2d at 151. In *Glezerman*, the broker had a practice of informing the decedent when the annual premium was due. *Id.* at 147. The premiums themselves were sometimes paid directly to the broker, including one for $15,000. *Id.* at 148. The broker would notify the decedent as to which financial account to use to pay the premium. *Id.* The broker and the decedent also established a special procedure whereby the broker would alert the decedent as the grace period drew to a close so that the decedent could pay the premium at the very last moment. *Id.* The plaintiff in *Glezerman* alleged that the broker failed to inform the decedent that his policy had lapsed, thus preventing the decedent from making a special late payment to reinstate the policy. *Id.* at 149. The Third Circuit held that the special relationship between the decedent and the broker, if true, established the "something more" required by New Jersey law to create additional responsibilities on the broker. *Id.* at 150. The court consequently reversed the district court's grant of summary judgment to the defendant broker. *Id.* at 155.

Unlike *Glezerman*, Beckett and Moore did not have a special relationship that would place additional responsibilities on Beckett. Moore paid the premiums directly to Guardian Life and did not rely on Beckett to tell him when to make the payments. There is no evidence in the record that Beckett ever contacted Moore about the pending expiration of a grace period. In addition, we note that the broker in *Glezerman* communicated with his clients about the pending expiration of a grace period for a premium due on an annual basis. In contrast, Moore paid his premiums on a monthly basis through the automatic withdrawal system. It would be unduly onerous for brokers to warn every client who misses a monthly premium due date that the client must pay the amount by the end of the grace period or face forfeiture. Finally, we note that the plaintiff in *Glezerman* alleged that the broker failed to notify the decedent of a policy that had lapsed. Goduti–Moore, in contrast, alleges that Beckett should have alerted Moore that the Policy would lapse if he did not pay the premium. (Third–Party Compl. ¶ 57.) Goduti–Moore has not pointed to any authority establishing

---

7. For the sake of clarity, we will refer only to Beckett, and not to his agency NPC, in the following analysis.

such a duty. In accordance with our analysis of New Jersey and New York law, we find that Beckett did not have a duty to inform Moore that the Policy would lapse at the end of the grace period.

We also reject Goduti–Moore's argument that Beckett violated his Field Representative Agreement ("Agreement") with Guardian Life and that Moore was a third-party beneficiary of the Agreement. Goduti–Moore alleges that Beckett violated a clause in the Agreement that required him to "aid in the maintenance of insurance in force" to the detriment of Moore. (Am. Third–Party Compl. ¶¶ 97, 101.) However, Moore was a third-party beneficiary to the Agreement only if Guardian Life and Beckett intended him to be. *See Broadway Maintenance Corp. v. Rutgers*, 90 N.J. 253, 259, 447 A.2d 906, 909 (1982) ("[T]he real test [of whether a third-party beneficiary is created] is whether the contracting parties intended that a third party should receive a benefit which might be enforced in the courts."); *see also Mortise v. United States*, 102 F.3d 693, 697 (2d Cir. 1996) (applying New York law) ("Generally, only an intended beneficiary of a contract may assert a claim as a third-party beneficiary."). Our reading of the Agreement does not reveal any evidence that either Beckett or Guardian Life intended that an insured receive a benefit from the Agreement that could be enforced in court. (*See* Belsole Certif., Ex. 7 at E: Field Representative Agreement.) It may be true that Moore was an incidental beneficiary of the Agreement but that alone is not enough to make him a third-party beneficiary. Accordingly, we will grant third-party defendants' motion for summary judgment.